**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 8, 2014
Decided October 23, 2014

**Before**

RICHARD A. POSNER, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 13-2155

| | |
|---|---|
| RONALD C. MACON, JR., | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Central District of Illinois. |
| | |
| *v.* | No. 12-1090 |
| | |
| SYLVIA MAHONE, DENNIS LARSON, | James E. Shadid, |
| and WEXFORD HEALTH SOURCES, INC., | *Chief Judge*. |
| *Defendants-Appellees*. | |

**O R D E R**

Ronald C. Macon, Jr., an Illinois prisoner, began dialysis treatment for chronic kidney disease in 2010. He sued the prison's healthcare providers under 42 U.S.C. § 1983, alleging that they knew about his failing kidneys before 2010 but did nothing to treat the condition. Their deliberate indifference, he contends, allowed his disease to deteriorate to the point of requiring dialysis.

Macon was required to exhaust administrative remedies before filing suit, and Illinois requires that prisoners file grievances not later than 60 days after discovering the incident or problem giving rise to the grievance. Macon filed his grievance in June

2011; the defendants argued that it was untimely. The district court held a *Pavey* hearing and found that Macon was aware in 2010 that prison doctors may have ignored warning signs of his kidney disease. Because the grievance was untimely, the court entered summary judgment for the defendants. We affirm.

## I. Background

In 2003 Macon began serving a prison sentence for a murder conviction and since then has seen prison medical staff often. Beginning in 2007, while he was housed at the Pontiac Correctional Center, doctors Sylvia Mahone and Dennis Larson, employees of Wexford Health Sources, Inc., treated Macon for hepatitis C and liver disease. In January 2010 the Pontiac medical director told Macon that he was also "having problems with [his] kidneys" and ordered a kidney biopsy. The results indicated that Macon was nearing end-stage renal disease. He began dialysis treatment in August 2010.

Shortly after starting dialysis, Macon received information suggesting that his doctors knew about his kidney disease before 2010. His sister, a registered nurse, told him that kidneys do not "just fail all of a sudden," and there should have been warning signs of his kidney disease. Then, in November or December of 2010, his dialysis nurse at Stateville (where he was transferred after starting treatment) explained that the warning signs of his kidney disease would have been evident "from [his] prior blood work." Since 2007, when he began treatment for hepatitis and liver disease, Macon's doctors had tested his blood nearly every month. Macon admitted that the nurse's comments "raised [his] concerns" about whether his doctors had been indifferent to his kidney condition.

Macon sought copies of his lab reports four times, although the record does not reflect when. He received them in June 2011 and, because he had only an elementary-school education, asked his dialysis nurse to read and interpret them. His nurse said that the creatinine level in his blood—an indicator of kidney disease—had been higher than the "normal range" before 2010. The records showed that his creatinine level was normal during 2007 and half of 2008, but it began to elevate slightly in June 2008. A year later, in June 2009, the level had risen further; and by January 2010, when the medical director told Macon about his kidney disease, it was high. This information confirmed for Macon that his doctors had indications of kidney disease before 2010.

Macon filed a grievance with the Administrative Review Board in June 2011, alleging that his doctors knew about and ignored his disease. When the Board did not respond, Macon sued under § 1983, contending that the doctors' indifference violated the Eighth Amendment. The defendants moved for summary judgment, asserting that Macon had failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). The district court then held a *Pavey* hearing on the exhaustion issue, *see Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008) ("*Pavey I*"), with Macon as the sole witness.

After the hearing, the district court granted the motion for summary judgment. Although the defendants disputed that Macon had filed a grievance at all, the judge assumed that Macon had indeed filed a grievance in June 2011. To be timely, the grievance had to be filed within 60 days of Macon's discovery of the problem that gave rise to the grievance. The judge found that Macon learned about his doctors' alleged indifference when the Pontiac medical director diagnosed his kidney disease in January 2010, or at the latest, by the end of 2010 after his sister and his dialysis nurse told him that signs of his kidney disease would have been evident earlier. The judge rejected as "not credible" Macon's assertion that he did not discover the alleged indifference until June 2011, when he reviewed his medical records, rather than at any of "the handful of times in 2010 when he was told, point blank, by trained medical professionals that he had a kidney condition which would not have happened suddenly." Because Macon's grievance was untimely, the judge entered summary judgment for the defendants.

## II. Discussion

To properly exhaust a prison grievance in Illinois, a prisoner must file it on time and in the right manner. A timely grievance is filed within 60 days of the "discovery of the incident, occurrence, or problem that gives rise to the grievance." ILL. ADMIN. CODE tit. 20, § 504.810(a). Ordinarily a prisoner also must first attempt to resolve a complaint with his counselor before filing a written grievance with a grievance officer. *Id*. § 504.810(a), (b); *see also Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011). But here, as Macon correctly argues, he could submit his grievance directly to the Administrative Review Board because he grieved conduct that occurred at a facility where he was no longer incarcerated. *See* ILL. ADMIN. CODE tit. 20, § 504.870(a)(4); *Dole v. Chandler*, 438 F.3d 804, 807 (7th Cir. 2006). So the only issue is whether Macon filed his grievance on time.

Macon argues that he did not discover the "incident, occurrence, or problem [giving] rise to [his] grievance" until June 2011. He concedes that he first learned of his kidney disease in January 2010, but maintains that he did not discover that prison doctors may have known about it earlier until he received his medical records in June 2011. After holding an evidentiary hearing as required by *Pavey I*, the district court rejected that claim as "not credible" and found that Macon learned in 2010 that doctors may have known about his condition earlier. We review the court's factual findings and credibility determinations for clear error. *See* FED. R. CIV. P. 52(a)(6); *Pavey v. Conley*, 663 F.3d 899, 904 (7th Cir. 2011) ("*Pavey II*"). The judge's findings are supported by the record. Accordingly, we cannot say that the court clearly erred.

Macon testified that after starting dialysis in August 2010, he learned from his sister, a nurse, that his kidney disease would have developed slowly, with earlier warning signs. Three or four months later his dialysis nurse told him that his blood work before 2010 would have revealed those warning signs. And Macon knew, from having blood tests almost monthly since 2007, that his doctors would have received this blood work regularly before 2010. And he concedes that the information from his nurse "raised [his] concerns" that his doctors had known about his disease before 2010. On this record, the district court reasonably found that Macon discovered the doctors' possible indifference to his kidney disease by the end of 2010, despite his claim that he didn't learn of it until June 2011. *See Pavey II*, 663 F.3d at 904 (holding that the district court did not clearly err in declining to credit prisoner's testimony about exhaustion); *United States v. Norris*, 640 F.3d 295, 297 n.1 (7th Cir. 2011) (explaining that a credibility determination may be disturbed only if "completely without foundation"). Accordingly, Macon's deadline to file a grievance was, at the latest, March 1, 2011 (60 days after the end of 2010), and his June 2011 filing was untimely.

Macon argues that he did not have firm evidence that his doctors had indications of kidney disease before 2010 until he received his lab reports in June 2011. He is essentially suggesting that in his case waiting for the reports provided "good cause" for his filing delay. A prisoner who demonstrates "good cause" for an untimely filing fulfills his requirement to exhaust administrative remedies. ILL. ADMIN. CODE tit. 20, § 504.810(a). "Good cause" is not defined by the Illinois regulation, but we have held that physical incapacitation would justify a late filing. *See Hurst v. Hantke*, 634 F.3d 409, 412 (7th Cir. 2011).

Macon's decision to wait for lab reports to confirm his "concerns," which he concedes arose in 2010, is not good cause for his late filing. The reports may have helped to *prove* his doctors' earlier knowledge, but the statements from his nurse and his sister, also a nurse, were enough for Macon to realize the grounds of his grievance.

Moreover, although he told the district court that he had to ask for the reports four times before receiving them, he did not say when he *first* asked for them. In opposing the defendants' motion for summary judgment, Macon had the opportunity to submit evidence of his prompt diligence. *See Hurst*, 634 F.3d at 412. Without that evidence, however, and given his prior awareness that his doctors may have ignored signs of disease, Macon has not shown good cause for the untimely filing.

Finally, although Macon is now represented by counsel, he submitted a pro se supplemental brief on appeal arguing that the district court abused its discretion in denying his multiple motions for recruited counsel. *See* 28 U.S.C. § 1915(e)(1). He argues that his limited education and health conditions affected his capacity to litigate the case by himself. But the district court applied the correct legal standard for recruitment of counsel, *see Pruitt v. Mote*, 503 F.3d 647, 654–55 (7th Cir. 2007) (en banc), and reasonably found that based on the quality of his previous filings and his current access to his medical records, Macon could adequately litigate the issue of exhaustion. *See Olson v. Morgan*, 750 F.3d 708, 711–12 (7th Cir. 2014). Moreover, the principal argument that Macon wanted to advance in the district court—that he needed the lab reports before filing his grievance—is one that we have considered and rejected. Therefore, no prejudice resulted from the decision not to recruit counsel. *See Gruenberg v. Gempeler*, 697 F.3d 573, 581–82 (7th Cir. 2012).

AFFIRMED.